**Anita Mae HILL, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 07–93–0156–CR.

Court of Appeals of Texas, Amarillo.

Sept. 19, 1994.

Rehearing Denied Oct. 17, 1994.

Joe Marr Wilson, Amarillo, for appellant.

Randy Sherrod, Crim. Dist. Atty., John L. Owen, Canyon, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

A jury found appellant Anita Mae Hill criminally responsible as a party to the first

degree felony offense of injury to a child, and assessed her punishment at confinement for ten years, probated, and a fine of $10,000.00. Because, contrary to appellant's first-point-of-error contention, the evidence is sufficient to support the jury's verdict, we will affirm.[1]

By its indictment, the State alleged that on or about 11 May 1990, appellant intentionally and knowingly engaged in conduct that caused serious bodily injury to Jason Hill, a child who was 14 years of age or younger, by striking him on the hip and leg with a deadly weapon, a metal bar, which in the manner of its use was capable of causing serious bodily injury or death.[2] Appellant was prosecuted, and found guilty, under the law of parties.[3] Tex.Penal Code Ann. §§ 7.01, 7.02(a)(2) (Vernon 1994). A summary of the evidence is necessitated by appellant's challenge to the sufficiency of the evidence to support the jury's verdict.

Jason Hill, the nine year old son of appellant and her husband, Marvin Hill, was admitted to Northwest Texas Hospital on 17 May 1990 with severe and infected bruises and injuries, admittedly inflicted by his father in "spanking" him with a metal rod. Carolyn Jordan, a registered nurse, noticed Jason had various bruises and injuries obviously inflicted at different times, some of which were emitting a greenish pus with blackened, dead skin over or around them. The injuries were the worst she had ever seen, and were of a type causing permanent disfigurement.

Jason was treated by Dr. Jose Areas, a surgeon, who observed areas of tissue sloughing off with no blood supply, fairly deep wounds going to the muscle, and an injured bone near Jason's right wrist. X-rays showed healing fractures, two to four weeks old, to eight of Jason's ribs. Noting the extensive tissue necrosis on Jason's buttocks and thighs, Dr. Areas explained that the tissue damage and fractures would be quite painful, that normally medical treatment would be sought, and that unexplained fractures of the nature Jason sustained usually constituted child abuse. To facilitate the healing of the infection in the surrounding tissue, the dead tissue had to be removed and, once healed, skin grafts would have to be performed to cover the defect. Jason was, in the doctor's opinion, subjected to "pretty extensive abuse." Shown the metal rod used by Marvin to inflict the injuries, Dr. Areas expressed the opinion that the rod was capable of causing serious bodily injury or death to a nine year old boy.

Marvin confessed to Corporal Michael Allen, an Amarillo police officer, that several days before, he had taken a metal rod from a screen door, located at his home, and spanked Jason. Although he spanked Jason repeatedly, Marvin said he did not realize he had injured him that badly. When Jason's injuries were not healed with Marvin's and appellant's treatment of them with a heat lamp, epsom salts, and capsules, Jason was taken to the hospital.

Proceeding to the Hill residence were Corporal Allen; Bobby Miller, a police identification technician, who had photographed Jason at the hospital; and Kim Wrazidlo, a caseworker with the Texas Department of Protective and Regulatory Services, who observed and questioned Jason at the hospital and took protective custody of him. At the residence, Allen, after advising appellant of

---

1. Prior to submission, appellant abandoned the other two points of error presented in her brief.

2. At the time of the offense alleged by the State, the penal statute provided, as material to this prosecution, that:

 (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, engages in conduct that causes to a child ...:

 (1) serious bodily injury[.]

 $*$ $*$ $*$ $*$ $*$ $*$

 (c) In this section:

 (1) "Child" means a person 14 years of age or younger.
 Act of June 14, 1989, 71st Leg., R.S., ch. 357, § 1, 1989 Tex.Gen.Laws 1441 (amended 1993) (current version at Tex.Penal Code Ann. § 24.04 (Vernon 1994)).

3. Although the indictment contained the State's notice of intent to seek an affirmative finding of the use or exhibition of a deadly weapon, the jury refused to make that finding.

her rights, obtained her consent to search the home.

When asked if the metal rod used to spank Jason was still present, appellant initially said it was not, because she thought Marvin had gotten rid of the instruments used, but upon further reflection, she led Miller directly to the rod behind a small woodpile in the backyard. Miller retrieved the rod, broken into two pieces, which Jason said happened when Marvin beat him, and several stakes, one of which, referred to as a branch, had head hair clinging to it.

While Miller was retrieving the metal rod, Allen examined Jason's three younger sisters, Jennifer, Heidi, and Hannah. He found red marks on the buttocks, and knots upon the skulls, of Jennifer and Heidi. When Miller returned to the residence, he noticed bumps on the heads of Jennifer and Heidi. When Miller talked with Jennifer, she affirmed that Marvin had spanked her with a metal bar or pipe. The next day, Jennifer, Heidi, and Hannah were placed in the custody of the Texas Department of Protective and Regulatory Services.

Jason testified that for several years before the event leading to the prosecution, Marvin, and sometimes appellant herself, would beat him with a metal rod or stick. Jennifer and Heidi, who had been beaten by Marvin in their parents' bedroom, confirmed Jason's beatings by his father, and Jennifer said that when appellant asked Marvin not to do those things, he would become abusive toward her. Usually, Jason said, appellant would report to Marvin that he had been bad, and Marvin would beat him. On the occasion of the event, Marvin came home from work, had a conversation with appellant, got Jason out of his room, told appellant to leave, took Jason into the Hills' bedroom, shut the door, and beat him.

Linda Cheek, who had known appellant for about nine years and had taught Jason in Sunday school when he was four or five years old, gave testimony that she noticed when she raised her hand to write on a chalkboard, Jason would cower. She stated that when she talked with appellant two or three months before trial, appellant said that Marvin had always been abusive, he had beaten the children, and she knew about the beatings.

The testimony of Karlene Conner, the Hills' former next door neighbor, was that Jason acted scared all the time, and he would recoil from her anytime she made a movement toward him. On six or seven occasions when Marvin was not home, she would hear the children screaming, "no, Mommy, no," for periods of at least one hour. Her daughter, Leslie Conner, said the family stopped using their backyard swimming pool because they got tired of hearing the Hill children crying all day and screaming, "No, mommie (sic). Please, mommie (sic), stop." When Karlene Conner, who in 1984 had communicated her observations to the Department of Human Services,[4] talked with appellant about discipling the children, appellant often quoted the Bible, saying, "Spare the rod, spoil the child."

On one occasion in June of 1987, James R. Steiner, Jr., a repairman servicing an air conditioner at the Conner residence, heard, through an open window of the Hill residence, "a lady in there beating her kid," who was crying. After listening to this for an hour and a half, he reported it to Karlene Conner, and later telephoned the Department of Human Services.

Kim Wrazidlo, the Texas Department of Protective and Regulatory Services caseworker who accompanied the officers to the Hill residence, said appellant was concerned with what was happening to Marvin, and did not inquire about Jason. Wrazidlo outlined the actions taken by the Department in 1984 in response to previous reports. Appellant was offered parenting courses in which physical discipline was not encouraged. Judy Burgess, the supervising caseworker, had seven home visits with appellant in 1987 to stress alternative disciplinary techniques in avoidance of physical punishment. She ex-

---

**4.** Later, the Department of Human Services was renamed the Texas Department of Protective and Regulatory Services.

plained to appellant that injuring a child, even in the course of discipline, was illegal.

In her defense, appellant recalled Wrazidlo, who identified and was questioned about her videotaped interview with Jason, which was admitted into evidence. After the taping, she met with appellant, who never said she had beaten Jason, but indicated a general feeling of guilt for what happened to Jason, and that she was aware Marvin would discipline the children if she told him they were bad. She did not take appellant's statements to mean that she had actually participated in the beating of Jason.

After the emergency hearing requested by the Department to remove the Hill children to a foster home, Rick Keffler, an attorney who represented appellant at the hearing, drove Marvin to the hospital. He recalled that Marvin said he alone had caused the injuries to Jason and that appellant did not have anything to do with it. Betty Walsh, who had hired appellant to take telephone orders for a catalog business, testified that in front of the courthouse, after either the hearing or Marvin's arraignment, she visited with Marvin, who said, "I did it, Anita didn't have anything to do with it."

Appellant's friend, Nadine Boyd, who knew the Hills since 1985 and often visited in their home, testified that when she was with appellant and the children in the absence of Marvin, there was no violence and the children acted normal, but when Marvin was present, the children were very subdued and quiet. She never saw any injuries on the children.

Jan Markham, who lived with the Hills for two months in 1988 and saw appellant daily until she moved away, stated it was a very pleasant atmosphere, the children were not afraid of appellant, and showed her great affection. Marvin was extremely strict, the children appeared to be fearful of him, and he was cruel to them.

Pat Walsh generally confirmed the testimony of his wife, Betty Walsh, Boyd and Markham. He stated the children were quiet, that appellant was a very solicitous mother, and that he saw no signs of physical abuse on the children.

Given this evidence, appellant presents two challenges to its sufficiency to support her conviction. Initially, she points out that to convict her under the law of parties, the State had to prove conduct by Marvin that constituted an offense, plus conduct by her with the intent to promote or assist Marvin's conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex.Cr.App.1985). Then, albeit conceding the evidence is undisputed that Marvin struck Jason repeatedly with a metal bar causing serious bodily injury, appellant suggests that since the injury-to-a-child statute under which she was prosecuted has been construed to be a result-oriented offense, *Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Cr.App.1990), it is arguable no proof was presented that Marvin intended to cause serious bodily injury to Jason. The suggestion is not well-founded.

 Granted that the offense of injury to a child is a result-oriented offense, a person acts with intent with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Cr.App.1982). Ordinarily, and in the absence of a judicial confession, intent must be inferred from the acts of the accused and the surrounding circumstances, *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Cr.App.1984), as well as from the words of the accused. *Dues v. State*, 634 S.W.2d at 305.

 Acts of the accused and surrounding circumstances sufficient to support the inference of the intent to cause serious bodily injury are evidence of prior abuse by the accused and recent injury to the child, *Scott v. State*, 732 S.W.2d 354, 359 (Tex.Cr.App. 1987), evidence of significant force applied by the accused to produce severe injuries to the child, *Morales v. State*, 828 S.W.2d 261, 265 (Tex.App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex.Cr.App.1993), evidence of injuries to the child coupled with the accused's admission that he had "beaten" the child, *Skidmore v. State*, 838 S.W.2d 748, 751–52 (Tex. App.—Texarkana 1992, pet'n ref'd), and evidence of the accused's failure to secure medical aid known to be needed for the injuries inflicted. *Tezino v. State*, 765 S.W.2d 482, 485 (Tex.App.—Houston [1st Dist.] 1988,

pet'n ref'd). Within the evidence previously recorded, are Marvin's acts of prior abuse by application of significant force which produced broken ribs and other severe injuries to Jason, whom Marvin admitted he had beaten, and Marvin's failure to secure immediate medical treatment for Jason's severe injuries. Although Marvin said he did not realize he had injured Jason that badly, the jury, as the judge of the credibility of the witnesses and the weight to be given their testimony, *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Cr.App.1992), was free to reject Marvin's belated and self-serving attempt to conceal his intent. *Turner v. State,* 805 S.W.2d 423, 427 (Tex.Cr.App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). Consequently, any rational trier of fact could have found from this evidence beyond a reasonable doubt that Marvin intended to cause serious bodily injury to Jason.

■ Next, appellant shifts the focus of her evidential insufficiency contention to her role. For appellant to be criminally responsible for the offense committed by Marvin, the evidence must show that

> acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1994). Appellant contends that the evidence does not show any act on her part which promoted or assisted Marvin in the commission of the offense, but if there is, then there is absolutely no evidence of her intent to promote or assist the commission of the offense of causing serious bodily injury to Jason.

In developing her contention, appellant asserts that the only evidence of an act she performed that assisted Marvin in the commission of the offense was the testimony of a conversation between her and Marvin just before the beating. She proposes that the testimony required an inference by the jury that she told Marvin of Jason's bad behavior, which was not shown by the evidence. However, she argues that, assuming arguendo she did tell Marvin that Jason had been bad and she knew Marvin probably would discipline Jason, there is absolutely no evidence that in doing so, she intended to promote or assist the commission of the offense of causing serious bodily injury to Jason.

■ Appellant acknowledges that in determining whether an individual is a party to an offense and bears criminal responsibility, the court may look to events before, during, and after the commission of the offense. Circumstantial evidence may be sufficient to show that an individual is a party to the offense, and it is not necessary that the individual be present at the scene of the crime. *Morrison v. State,* 608 S.W.2d 233, 234 (Tex.Cr.App.1980).

From the evidence, the jury could discern a pattern, existing during a number of years, that on the occasions when Marvin arrived home from work and appellant told him one of the children had been bad, Marvin would take the child into his bedroom and "spank" the child with a metal rod or a stick. There was evidence that these "spankings" had resulted in physical injuries to the children, including knots on the heads of Jennifer and Heidi, and the fracture of eight of Jason's ribs. On some of these occasions appellant would be present; at other times she would leave the house at Marvin's direction. The jury reasonably could infer from the evidential pattern that on the last occasion when Marvin arrived home and engaged in a conversation with appellant, followed by Marvin's immediate beating of Jason, appellant had told Marvin Jason had been bad, knowing that Marvin would "spank" him. Thus, the evidence is sufficient for the jury to find that appellant, albeit not present during the "spanking," acted to promote or assist in the "spanking" of Jason.

■ Nevertheless, appellant proposes, without disagreement by the State, that to be criminally responsible, the evidence must show not only that she acted to promote or assist in Jason's "spanking," but that she intended to promote or assist the commission of the offense of causing serious bodily injury to a child. Neither party has cited authority directly supporting or contradicting appellant's contention; however, as next explained, we deem appellant's proposition to

be correct under the construction given the pertinent statutes, and we will resolve her contention that there is absolutely no evidence that she intended to promote or assist the commission of the offense of causing serious bodily injury to a child.

 The "spanking" Marvin administered to Jason was not criminal within itself; it only became criminal by the construction of the penal statute, section 22.04(a)(1), *supra,* when Marvin administered the "spanking" with the intent that it would result in serious bodily injury. *Haggins v. State,* 785 S.W.2d at 828. Then, to be criminally responsible for the offense committed by Marvin, appellant had to act "with the intent to promote or assist the commission of the offense." Tex. Code Crim.Proc.Ann. § 7.02(a)(2), *supra.* It follows that appellant is criminally responsible for the offense committed by Marvin only if the evidence shows that she *knew Marvin's unlawful intent* when she acted to promote or assist in his conduct. *Accord Amaya v. State,* 733 S.W.2d 168, 174–75 (Tex.Cr. App.1986).

The evidence heard by the jury included testimony bearing on appellant's knowledge of Marvin's unlawful intent. Jason testified that for several years, appellant and Marvin would beat him with a metal rod or stick. Appellant, despite counseling in 1984 in avoidance of physical punishment and being told in 1987 that injuring a child was illegal, not only physically abused the children, often saying, "Spare the rod, spoil the child," but was aware that Marvin would discipline the children if she told him that they had been bad. She reportedly said that Marvin had always been abusive, he had beaten the children, and she knew about the beatings. The jury reasonably could find that appellant, knowing of Marvin's abusive beatings which were inflicted when she told him the children had been bad, must, as the mother of the children, have had knowledge of the serious bodily injuries previously inflicted upon the children, which were obvious to strangers. From this evidence, the jury could reasonably infer that when she had the conversation with Marvin, she knew Marvin would beat Jason with the intent to cause serious bodily injury.

Consequently, the evidence, viewed in the light most favorable to the verdict, is sufficient for any rational trier of fact to have found appellant criminally responsible for the offense committed by Marvin beyond a reasonable doubt. Her point of error is overruled.

The judgment is affirmed.